COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Huff, Judges Frank, Humphreys, Felton, Kelsey, Petty, Beales,
          Alston, McCullough, Chafin and Decker
Argued at Richmond, Virginia

LOREN ANTHONY MASON, JR.
                                                    OPINION BY
v.       Record No. 1542-13-2            JUDGE D. ARTHUR KELSEY
                                                 FEBRUARY 3, 2015
COMMONWEALTH OF VIRGINIA

UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF SUSSEX COUNTY
W. Allan Sharrett, Judge

Paul S. Roskin (Vergara & Associates, on brief), for appellant.

Kathleen B. Martin, Senior Assistant Attorney General
(Mark R. Herring, Attorney General, on brief), for appellee.


The trial court convicted Loren Anthony Mason, Jr., of various drug offenses[1] based

upon evidence obtained during a traffic stop of a vehicle in which he was a passenger. Prior to

trial, Mason moved to suppress the evidence, claiming that the traffic stop was unconstitutional.

The trial court disagreed, denied the motion, and convicted Mason of the charged offenses.

On appeal, Mason challenges the trial court's denial of his motion to suppress. A divided

panel of this Court agreed with Mason, reversed the trial court's ruling on the motion to

suppress, and remanded the matter to the trial court. Mason v. Commonwealth, 63 Va. App.

587, 760 S.E.2d 831 (2014). We granted the Commonwealth's petition for rehearing *en banc*,

vacated the panel opinion, and now affirm the decision of the trial court.[2]

---

[1] These offenses include distribution of marijuana, Code § 18.2-248.1; possession of a
Schedule I or II controlled substance, Code § 18.2-250; and possession of a Schedule I or II
controlled substance with the intent to distribute, Code § 18.2-248.

[2] On January 1, 2015, Judge Huff succeeded Judge Felton as chief judge. Justice Kelsey
prepared and the Court adopted the opinion in this case prior to his investiture as a Justice of the
Supreme Court of Virginia. Judge Felton and Judge Frank participated in the hearing and
decision of this case prior to the effective date of their retirements on December 31, 2014.

PUBLISHED

I.

We restate the facts "in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences." Glenn v. Commonwealth, 49 Va. App. 413, 416, 642 S.E.2d 282, 283 (2007) (*en banc*) (internal quotation marks omitted), aff'd, 275 Va. 123, 654 S.E.2d 910 (2008). "In doing so, we consider facts presented both at the suppression hearing and at trial." Elliott v. Commonwealth, 61 Va. App. 48, 51, 733 S.E.2d 146, 148 (2012).

In this case, a police officer testified that, while operating a stationary radar unit, he saw a sedan with a "dangling object" that was "hanging from the rearview mirror." App. at 24. The officer testified that he "saw it clearly" as the vehicle "went by" him at "approximately 2:30 in the afternoon." Id. at 21, 31. The object, reproduced below, was admitted into evidence.



In his testimony, the officer identified this object as the "dangling object that [he] saw on that particular day." Id. at 24. It is an opaque parking pass measuring five inches long and three inches wide. When asked if the dangling parking pass that he observed "could obstruct a driver's view," the officer replied unequivocally, "It could, yes, ma'am." Id. at 31. Code § 46.2-1054 prohibits, among other things, any object from being "suspended from any part of the motor vehicle in such a manner as to obstruct the driver's clear view of the highway through the windshield, the front side windows, or the rear window." Mason conceded in the trial court that the officer made a traffic stop of the sedan believing that "he was acting properly" pursuant to Code § 46.2-1054. Id. at 89.

At the time of the traffic stop, Mason was a passenger in the sedan. The officer intended to issue the driver a summons for driving without a seatbelt and for violating Code § 46.2-1054. Prior to issuing the summons, however, the officer asked the driver if he would consent to a "weapons" pat down. Id. at 58. The driver consented, and the officer found marijuana on the driver during the pat down.

The officer then searched the sedan and found a backpack containing cocaine, ecstasy pills, a "large sum of individually wrapped bags" of marijuana, id. at 130, a digital scale, and a box of plastic bags. Other evidence established that the backpack belonged to Mason. The officer then arrested Mason for possession of drugs. A search of Mason incident to his arrest yielded $3,381 in cash and a cell phone on his person.

Prior to trial, Mason sought to suppress all incriminating evidence gathered during the traffic stop on the basis that no officer could reasonably suspect that the parking pass violated Code § 46.2-1054. At the suppression hearing, the trial judge made various remarks from the bench suggesting his inclination to grant the motion to suppress. After making these remarks, however, the judge "asked for additional time to consider" the issue, id. at 101, and issued an

order stating that the court needed "more time to deliberate on the motion to suppress," id. at 98. The trial judge also took a "view of the scene," id. at 101, to determine if the parking pass could obstruct a driver's vision in a sedan similar to the one that the officer had stopped. See Oral Argument Audio at 9:47 to 9:55, 26:04 to 26:30 (Apr. 1, 2014) (stipulation of counsel).

At a later hearing, the judge advised counsel that he had reconsidered his earlier remarks.[3] He said that his initial "concern" was that the parking pass did not "*substantially* obstruct*" the driver's view of the highway. App. at 102 (emphasis added). But after reviewing the caselaw "stacked up against [him]," the judge explained, he realized that neither the statute nor the reasonable suspicion standard required a substantial obstruction. Id. at 105. The case law he reviewed included an unpublished opinion from our Court, Commonwealth v. Bryant, No. 0076-04-1, 2004 Va. App. LEXIS 283, at *4 (Va. Ct. App. June 15, 2004), which reversed a suppression order when an officer had stopped a vehicle displaying an "air freshener hanging from the rear view mirror" that "could" have obstructed the driver's view in violation of Code § 46.2-1054. Accord Richardson v. Commonwealth, No. 0946-13-3, 2014 Va. App. LEXIS 98, at *4, *11 (Va. Ct. App. Mar. 18, 2014) (upholding a traffic stop when the officer observed that an air freshener "could be in violation" of Code § 46.2-1054); Pegram v. Commonwealth, No. 1041-95-2, 1996 Va. App. LEXIS 611, at *2 (Va. Ct. App. Sept. 24, 1996) (validating a traffic

---

[3] The trial judge's initial comments were superseded by the court's ultimate ruling and contemporaneous explanation for it. It is the court's holding — not the judge's off-the-cuff remarks from the bench — that accompanies the final order on appeal to us. Viewed in context, none of the judge's initial remarks (which he later explained were based upon an inaccurate legal standard) can be fairly deemed "factual findings." *Infra* at 17-18. Mason's argument to the contrary presents a good example of why "[w]e are particularly skeptical . . . of appellate efforts to piece together . . . fragmented remarks from the bench" in an effort to undermine the court's ultimate holding, White v. White, 56 Va. App. 214, 218, 692 S.E.2d 289, 291 (2010), and why we traditionally decline the invitation to "fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied," Damon v. York, 54 Va. App. 544, 555, 680 S.E.2d 354, 360 (2009) (internal quotation marks omitted).

stop pursuant to Code § 46.2-1054 given the officer's observation of a "large cloth object" hanging from the rearview mirror).

Acknowledging that he "initially disagreed" with the view taken by these unpublished (and thus nonbinding) opinions, the trial judge explained that "what carrie[d] the day" was the definition of "obstruction." App. at 105. "[U]ltimately it's the definition that persuaded the Court that that's what the law is intended and that's what the law says." Id. Repudiating some of his earlier statements, the trial judge held:

> [T]he Court is of the opinion that the standard for [the officer] to have stopped the vehicle was[:] is there *reasonable suspicion* that this object is . . . cutting off from sight or blocking an unhampered, . . . unrestricted *view of the highway*? Well, *there is reason to believe that it could be*, because there is an object dangling. He is entitled constitutionally to investigate further. So the Court believes that the presence of the object is, in fact, sufficient reasonable suspicion to justify a detention of the vehicle.

Id. (emphasis added).[4]  In short, the trial court explained, "[I]t's a parking pass, it's not a driving pass." Id. at 40.

II.

A.  THE REASONABLE SUSPICION STANDARD

Reasonable suspicion is simply suspicion that is reasonable.  It is not something more than suspicion.  And it can hardly be called proof.  To be sure, the degree of certitude required by reasonable suspicion is "'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less demanding than that for probable cause.'"  Perry v. Commonwealth, 280 Va. 572, 581, 701 S.E.2d 431, 436 (2010) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)); see also Navarette v. California, 134 S. Ct. 1683, 1687

---

[4] The trial judge had acknowledged earlier that "the question we have now is [whether there] is reasonable suspicion to believe that there is a traffic infraction taking place[.]  So again, is there reasonable suspicion to believe that [the parking pass] is obstructing . . . the driver's *clear view of the highway through the windshield*?"  App. at 40-41 (emphasis added); see also id. at 84.

(2014). Consequently, "the mere possibility of an innocent explanation does not necessarily exclude a reasonable suspicion that the suspect might be violating the law." Morris v. City of Va. Beach, 58 Va. App. 173, 183, 707 S.E.2d 479, 483 (2011) (internal quotation marks omitted).

No one can be arrested on the basis of reasonable suspicion. It serves merely to justify a brief detention to investigate. Because the need for justification is quite low, so too is the justifying legal standard. See 4 Wayne R. LaFave, Search & Seizure § 9.5(b), at 658-59 (5th ed. 2012) (noting that reasonable suspicion requires merely "that there exists at the time of the stop a substantial possibility — or, indeed, *even a 'moderate chance'* — that [unlawful] conduct has occurred, is occurring, or is about to occur" (emphasis added) (footnotes omitted) (quoting Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 371 (2009))).

In suppression hearings, a police officer usually takes the stand and describes what he saw and, occasionally, why he did what he did. While the first part is highly relevant, the second is not. "Examining the subjective intent of the officer 'is fundamentally inconsistent with our Fourth Amendment jurisprudence,' Kentucky v. King, 131 S. Ct. 1849, 1859 (2011), because 'the Fourth Amendment regulates conduct rather than thoughts,' Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080-81 (2011) (noting narrow exceptions)." Washington v. Commonwealth, 60 Va. App. 427, 435, 728 S.E.2d 521, 525 (2012).

For these reasons, settled precedent governing Fourth Amendment cases has "repeatedly rejected a subjective approach." Fernandez v. California, 134 S. Ct. 1126, 1134 (2014) (internal quotation marks omitted); see also Robinson v. Commonwealth, 273 Va. 26, 37, 639 S.E.2d 217, 223 (2007) (holding that the officer's "subjective motivation is irrelevant" (quoting Brigham City v. Stuart, 547 U.S. 398, 404 (2006))). A police officer's "action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the

- 6 -

circumstances, viewed *objectively*, justify the action.'"  Stuart, 547 U.S. at 404 (brackets

omitted) (quoting Scott v. United States, 436 U.S. 128, 138 (1978)); see also Navarette, 134

S. Ct. at 1687; Maryland v. Macon, 472 U.S. 463, 470-71 (1985).[5]  Consequently, an "officer's

*subjective characterization* of observed conduct is *not relevant*" to an objective application of

the Fourth Amendment.  Jones v. Commonwealth, 279 Va. 665, 673, 691 S.E.2d 801, 805 (2010)

(emphasis added and internal quotation marks omitted); see also Stuart, 547 U.S. at 404.[6]

Because courts "do not examine the subjective understanding of the particular officer

involved," Heien v. North Carolina, 135 S. Ct. 530, 539 (2014), it necessarily follows that, when

deciding a suppression motion, a court should not limit itself "to what the stopping officer says

or to evidence of his subjective rationale," Raab v. Commonwealth, 50 Va. App. 577, 583 n.2,

652 S.E.2d 144, 148 n.2 (2007) (*en banc*) (quoting United States v. Brown, 232 F.3d 589, 594

(7th Cir. 2000)).[7]  Courts should instead "look to the record as a whole to determine what facts

were known to the officer and then consider whether a reasonable officer in those circumstances

would have been suspicious."  LaFave, *supra*, § 9.5(a), at 647 n.22 (quoting United States v.

McKie, 951 F.2d 399, 402 (D.C. Cir. 1991)).  Because the reasonable suspicion test "is *purely*

---

[5] So strong is this principle that, even when an officer's testimony shows that he misjudged the legal basis for the stop, his subjective misjudgment does not undermine the objective validity of a stop that could be based on a wholly different legal basis.  See, e.g., Slayton v. Commonwealth, 41 Va. App. 101, 109, 582 S.E.2d 448, 451-52 (2003) (applying this principle to arrests); McGuire v. Commonwealth, 31 Va. App. 584, 596-97, 525 S.E.2d 43, 49 (2000) (same); Golden v. Commonwealth, 30 Va. App. 618, 625, 519 S.E.2d 378, 381 (1999) (same).

[6] See also Bond v. United States, 529 U.S. 334, 338 n.2 (2000); Whren v. United States, 517 U.S. 806, 813 (1996); Scott, 436 U.S. at 138; United States v. Johnson, 734 F.3d 270, 275 (4th Cir. 2013); United States v. Singh, 363 F.3d 347, 356 (4th Cir. 2004); United States v. McKie, 951 F.2d 399, 402 (D.C. Cir. 1991); Harris v. Commonwealth, 276 Va. 689, 697, 668 S.E.2d 141, 146 (2008); Robinson, 273 Va. at 37-38, 639 S.E.2d at 223-24.

[7] See Washington, 60 Va. App. at 434, 728 S.E.2d at 525; Shifflett v. Commonwealth, 58 Va. App. 732, 736 n.2, 716 S.E.2d 132, 135 n.2 (2011); Morris, 58 Va. App. at 179, 707 S.E.2d at 481; Thomas v. Commonwealth, 57 Va. App. 267, 273-75, 701 S.E.2d 87, 90-91 (2010); Armstead v. Commonwealth, 56 Va. App. 569, 579 n.7, 695 S.E.2d 561, 565 n.7 (2010).

objective," the reasonable suspicion standard imposes "no requirement that an *actual suspicion* by the officer be shown." Id. § 9.5(a), at 647 (second emphasis added). This approach "is obviously far preferable to a system based on the suppositions of individual officers." Fox v. Commonwealth, 43 Va. App. 446, 450, 598 S.E.2d 770, 772 (2004).

We thus reject Mason's contention that an officer making an investigatory stop must actually articulate, from the witness stand, the articulable facts and then explain, in his personal opinion, why these facts prompted him to be suspicious. Any assertion to the contrary is inconsistent with prior *en banc* precedent from our Court, Raab, 50 Va. App. at 583 n.2, 652 S.E.2d at 148 n.2, as well as the uniform view among courts that have addressed this issue.[8]

### B. OBSTRUCTING A DRIVER'S "CLEAR VIEW OF THE HIGHWAY"

Code § 46.2-1054 prohibits, among other things, any object[9] from being "suspended from any part of the motor vehicle in such a manner as to obstruct the driver's clear view of the highway through the windshield, the front side windows, or the rear window." Applied to a sedan, this portion of the statute has three components: (i) something "suspended" (ii) that serves to "obstruct" a "clear view of the highway" (iii) through the windshield, the front side windows, or the rear window. Id.

---

[8] See, e.g., United States v. Bailey, 622 F.3d 1, 5-6 (D.C. Cir. 2010); Brown, 232 F.3d at 594; United States v. Ozbirn, 189 F.3d 1194, 1198-99 (10th Cir. 1999); United States v. Swann, 149 F.3d 271, 272 (4th Cir. 1998); United States v. Jones, 990 F.2d 405, 408 (8th Cir. 1993); McKie, 951 F.2d at 402; United States v. Causey, 834 F.2d 1179, 1183-84 (5th Cir. 1987); United States v. Hawkins, 811 F.2d 210, 213 (3d Cir. 1987); State v. Heminover, 619 N.W.2d 353, 357 (Iowa 2000), abrogated on other grounds by State v. Turner, 630 N.W.2d 601, 606 n.2 (Iowa 2001); Zimmerman v. N.D. Dep't of Transp. Dir., 543 N.W.2d 479, 482-83 (N.D. 1996).

[9] Code § 46.2-1054 expressly exempts the "rear view mirror, sun visor, or other equipment of the motor vehicle approved by the Superintendent [of the Department of State Police]." See also Code § 46.2-1005 ("Procedure for approval of equipment").

By statute, a highway includes "the *entire width between the boundary lines* of every way or place open to the use of the public for purposes of vehicular travel in the Commonwealth, including the streets and alleys."  Code § 46.2-100 (emphasis added).  A highway is not, as Mason presumes, simply the stretch of pavement immediately in front of a driver's vehicle.  Under Virginia law, a "highway" is not limited "to a hard-surfaced or partly hard-surfaced way or to a dirt and gravel way.  It does not confine a highway to the main-travelled portion of the way or to lanes specifically designated for vehicular traffic."  Crouse v. Pugh, 188 Va. 156, 164-65, 49 S.E.2d 421, 426 (1948); see also Jessee v. Slate, 196 Va. 1074, 1083, 86 S.E.2d 821, 826 (1955).

Because a "highway" includes the "entire width between the boundary lines" of the "way or place" used by vehicular traffic, Code § 46.2-100, it includes overhead highway signs,[10] on-ramps and off-ramps, merge lanes, deceleration lanes, roadways,[11] bridges,[12] intersections,[13] shoulders,[14] pedestrian crosswalks,[15] and shared-use paths.[16]  Thus, a "clear view of the

---

[10] See Code § 46.2-100 (defining a "traffic control device" as "a sign, signal, marking, or other device used to regulate, warn, or guide traffic placed on, over, or adjacent to a . . . highway").

[11] A "roadway," narrower in scope than a highway yet still broad in terms of the surface area it includes, is defined as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, exclusive of the shoulder."  Id.  A highway may itself "include two or more roadways."  Id.

[12] See Nelson v. Cnty. of Henrico, 10 Va. App. 558, 561, 393 S.E.2d 644, 646 (1990).

[13] See Code § 46.2-100 (defining "intersection" as certain areas of highways that "join one another," cross an "intersecting highway," or are crossed "by a pedestrian crosswalk").

[14] A "shoulder" is defined as "that *part of a highway* between the portion regularly traveled by vehicular traffic and the lateral curbline or ditch."  Id. (emphasis added); see also Jessee, 196 Va. at 1083, 86 S.E.2d at 826.

[15] See Code § 46.2-100 (defining "crosswalk" as a "part of a roadway," which is part of a highway); see also *supra* note 13 (defining "intersection").

[16] "Shared-use paths" include bikeways and other paths that are open to "pedestrians, skaters, users of wheel chairs or wheel chair conveyances, joggers, and other nonmotorized users."  Code § 46.2-100.

highway," as used in Code § 46.2-1054, no doubt means the pavement itself and everything physically on it. It would make no sense for Code § 46.2-1054 to prohibit a dangling object from obstructing a driver's view of the pavement directly in front him but not a vehicle, bicyclist, or pedestrian[17] moving across that same pavement.

In this case, the police officer testified that he "clearly" observed the parking pass prior to stopping the vehicle. App. at 31. The parking pass is an exhibit. We need no description of it from the officer. We are looking at the very thing that the officer said he clearly saw: an opaque plastic card that is five inches long and three inches wide. And the trial judge had something even better. He took a "view of the scene" to determine if the parking pass could obstruct a driver's vision in a vehicle similar to the one that the officer had stopped. Id. at 101; see Oral Argument Audio at 9:47 to 9:55, 26:04 to 26:30 (Apr. 1, 2014).

Given these facts, we agree with the trial court that a reasonable officer could suspect that the opaque, five-by-three-inch parking pass dangling from a rearview mirror might violate Code § 46.2-1054 and thus warrant an investigatory stop. Several scenarios illustrate why. The bottom of the parking pass would be at or slightly above eye level for a driver of average height. The parking pass could be at an angle that might partially block a driver's clear view of a vehicle ahead and to the right of him. If that vehicle put on its left-turn signal, for example, the driver with the parking pass might not see it at all — particularly when the vehicle is merging into highway traffic from an on-ramp. If a driver simply wanted to make a right turn at an intersection, the parking pass could partially obscure his field of vision. An enhanced risk would exist when the driving occurs at night, and only the taillights of a vehicle ahead and to the right are visible. Consider, too, highway signs that are often placed overhead and on the right

---

[17] See Crouse, 188 Va. at 165, 49 S.E.2d at 426 ("The Motor Vehicle Code of Virginia recognizes the right of both the pedestrian and motorist to use the highways for travel.").

shoulder of the highway. A person of any height could have his clear view of highway signs partially obstructed by the parking pass, especially during nighttime driving.

It bears repeating that an officer need not have proof beyond a reasonable doubt of any of these scenarios before he makes a vehicular stop. Nor does he need to be convinced by a preponderance of the evidence. To be sure, the quantum of confidence need not even rise to the level of probable cause. See Perry, 280 Va. at 581, 701 S.E.2d at 436. It is enough that the officer is aware of facts that, viewed objectively, could give rise to a reasonable suspicion that the parking pass may be non-compliant with Code § 46.2-1054. Settled precedent has "consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" Navarette, 134 S. Ct. at 1691 (quoting United States v. Arvizu, 534 U.S. 266, 277 (2002)). In this respect, the law employs a "commonsense approach," id. at 1690, that takes into account "the totality of the circumstances — the whole picture," id. at 1687 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)), and asks simply whether unlawful activity "may be afoot," id. at 1690 (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)).

Mason does not directly challenge these principles. Instead, underlying much of his argument is the unstated, but implied, assertion that this type of traffic infraction is simply too trifling to warrant an investigatory stop. Underlying Code § 46.2-1054, however, is the General Assembly's unstated, but implied, recognition that a driver's ability to see clearly through an unobstructed windshield is crucial to the safety of the driver as well as others sharing the road. We certainly concur. At some point in every trial judge's career, he or she has heard a confounded witness, while testifying about a tragic automobile accident, say simply, "I don't know what happened. I just didn't see the other car." Given the multitude of other distractions competing for a driver's attention, it hardly makes sense for the law to treat as trivial the

- 11 -

perfectly reasonable suspicion that a five-by-three inch opaque parking pass, hanging from the rearview mirror of a sedan, could obstruct a driver's clear view of the highway.[18]

Needless to say, our holding does not endorse any *per se* rule authorizing traffic stops whenever an object of any kind is observed dangling from a vehicle's rearview mirror. While the prosecutor asserted as much in the trial court, see id. at 53, the Attorney General correctly disavowed the overstatement on appeal, see Oral Argument Audio at 14:56 to 15:10, 16:22 to 16:57 (Nov. 18, 2014). Code § 46.2-1054, after all, does not uniformly forbid drivers from dangling objects from their rearview mirrors — only those positioned "in such a manner as to obstruct the driver's clear view of the highway." We thus limit our holding to the suspected obstruction in this case: a five-by-three-inch opaque parking pass hanging from a rearview mirror of a sedan.

Finally, we acknowledge that the application of the concept of reasonable searches and seizures to Code § 46.2-1054's prohibition on dangling obstructions involves an inescapable exercise in judicial line-drawing. But, as Justice Holmes once said, we should not be "troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law." Irwin v. Gavit, 268 U.S. 161, 168 (1925). That we must, from time to time, make fine distinctions is no reason to abandon the task altogether[19] and treat all such dangling

---

[18] The dissent argues that the officer's "failure to investigate the existence of the alleged 'criminal activity' is fatal to any justification of Mason's seizure under Terry and its progeny." *Infra* at 16. Mason, however, never made that contention on appeal. To quote him: "In the instant case the only assignment of error is the failure of the trial judge to grant the defendant's motion to suppress evidence seized from the motor vehicle in which the defendant was riding following a traffic stop, *alleging that the officer in question did not have reasonable suspicion to make such stop.*" Appellant's Br. at 6 (emphasis added). See Rule 5A:12(c)(1)(i) (limiting appellate review to the assignment of error); Rule 5A:20(e) (requiring appellants to state clearly their "argument (including principles of law and authorities) relating to each assignment of error").

[19] As for the criticism that this line-drawing exercise requires a case-by-case approach, "truth be told, it is supposed to be this way. The reasonable suspicion standard itself is a

- 12 -

objects as indistinguishable.  A five-by-three inch opaque parking pass is obviously different from a high school graduation tassel or a tiny chain locket.  We thus have no fear that our holding will be misconstrued as a constitutional blank check for police officers to make traffic stops under circumstances wholly dissimilar from those presented in this case.[20]

### III.

In sum, the trial court correctly held that a reasonable officer could make an investigatory stop of the sedan in this case to determine if, in fact, the parking pass he observed violated Code § 46.2-1054.[21]  Finding no fault with the trial court's denial of Mason's motion to suppress, we affirm his convictions.

Affirmed.

---

'somewhat abstract' and 'elusive concept' that cannot be reduced to a 'neat set of legal rules.'" Shifflett, 58 Va. App. at 739, 716 S.E.2d at 136 (quoting Arvizu, 534 U.S. at 274).

[20] We agree with our dissenting colleagues that, even if Mason could challenge successfully the legality of the officer's stop of the sedan, that victory would not necessarily require the suppression of any incriminating evidence found during the officer's ensuing consensual searches of the driver or the sedan.  See generally Ellis v. Commonwealth, 52 Va. App. 220, 226, 662 S.E.2d 640, 643 (2008) ("Our analysis begins with the general rule that 'a search authorized by consent is wholly valid.'" (quoting Kyer v. Commonwealth, 45 Va. App. 473, 483, 612 S.E.2d 213, 218 (2005) (*en banc*))).

[21] On appeal, Mason argues that the officer's alleged reasonable suspicion was "based on a misapprehension of the law" and, for that reason, "was thus *per se* unreasonable and thus could not be the basis of a valid investigatory stop . . . ."  Appellant's Br. at 8.  The United States Supreme Court, however, recently rejected this very argument.  Heien, 135 S. Ct. at 539.  Given our holding, we need not address the dissent's effort to distinguish Heien. *Infra* at 20-23.

Humphreys, J., with whom Frank, Petty, Alston and Chafin, JJ., join, dissenting.

> The law of search and seizure with respect to automobiles is intolerably confusing.[22]
>
> Every day, millions are stopped for one of the myriad of regulations governing our use of public streets. As soon as you get into your car, even before you turn the ignition key, you have subjected yourself to intense police scrutiny. So dense is the modern web of motor vehicle regulations that every motorist is likely to get caught in it every time he drives to the grocery store.[23]

This case further exacerbates the intolerable confusion referred to by Justice Powell. "Prior to Terry v. Ohio, [392 U.S. 1 (1968),] any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause." Florida v. Royer, 460 U.S. 491, 498 (1983) (citation omitted). "Terry created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." Id. After today and insofar as motor vehicles are concerned, this exception is no longer particularly limited and has now swallowed the general rule. Despite the majority's assertion to the contrary, I believe that the majority opinion in this case will be read to provide "automatic" reasonable articulable suspicion for any officer to pull a citizen over if he/she observes *any* object dangling from a rearview mirror. Moreover, henceforth, reasonable suspicion justifying the seizure of citizens will be found even if police officers are mistaken concerning the law as long as their testimony includes magic words such as "I thought . . . I believed . . . I mistakenly believed . . . I suspected . . . I mistakenly suspected . . ." or as in this case, the officer just doesn't really know one way or the other. Therefore, I dissent from the analysis and judgment of the majority.

---

[22] Robbins v. California, 453 U.S. 420, 430 (1981) (Powell, J., concurring).

[23] Markus Dirk Dubber, Policing Possession: The War on Crime and the End of Criminal Law, 91 J. Crim. L. & Criminology 829, 874 (2001). The "War on Crime," "War on Drugs," and "War on Terror" have all been used to justify limits to basic Fourth Amendment protections. I would not add a "War on Dangling Objects" to that list.

## I. Reasonable Suspicion and the Fourth Amendment

Even a cursory review of <u>Terry</u> and the cases which follow it reveal often repeated language requiring specific facts in support of an officer's suspicion that criminal activity is afoot. "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989). "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." <u>Terry</u>, 392 U.S. at 21. "A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion." <u>Sokolow</u>, 490 U.S. at 10.

"To establish reasonable suspicion, an officer must be able to articulate more than an unparticularized suspicion or 'hunch' that criminal activity is afoot." <u>Rudolph v. Commonwealth</u>, 277 Va. 209, 210, 722 S.E.2d 527, 528 (2009). "This demand for specificity in the information upon which police action is predicated is the central teaching of [the United States Supreme Court's] Fourth Amendment jurisprudence." <u>Terry</u>, 392 U.S. at 21 n.18.[24] It is axiomatic that whether or not reasonable suspicion of criminal activity exists must be determined from "*the facts available to the officer at the moment of the seizure*." <u>Id.</u> at 21-22 (emphasis

---

[24] "The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle . . . . An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981) (citations omitted); <u>see</u> <u>also</u> <u>Delaware v. Prouse</u>, 440 U.S. 648, 663 (1979) (stopping an automobile and detaining the driver is unreasonable under the Fourth Amendment unless there is at least articulable and reasonable suspicion that the vehicle or an occupant is subject to seizure for violation of the law). When a police officer makes a traffic stop, the passenger is seized within the meaning of the Fourth Amendment and may challenge the constitutionality of the stop. <u>Brendlin v. California</u>, 551 U.S. 249, 251 (2007).

added). In this case, the facts do not create a reasonable suspicion of any traffic infraction or other violation of the law.[25]

Moreover, the majority overlooks the basic tenet of Terry that the sole constitutionally proper objective of a Terry stop is to confirm or dispel suspicion of criminal activity. Jurisprudence from various federal circuits supports this proposition. See e.g., United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008) ("If a police officer wants to detain a driver beyond the scope of a routine traffic stop . . . he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." (citation omitted)); [26] Croom v. Balkwill, 645 F.3d 1240, 1251 n.15 (11th Cir. 2011) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"); United States v. Andres, 703 F.3d 828 (5th Cir. 2013) (holding that a traffic stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges).

I dissent from the analysis and judgment of the majority and would reverse the trial court and remand this case for two reasons. First, Officer Richards's failure to investigate the existence of the alleged "criminal activity" is fatal to any justification of Mason's seizure under Terry and its progeny. Second, the testimony of Officer Richards articulated absolutely no facts

---

[25] "We must not allow our zeal for effective law enforcement to blind us to the peril to our free society that lies in this Court's disregard of the protections afforded by the Fourth Amendment." Royer, 460 U.S. at 513 (Powell, J., concurring).

[26] Another case from the same circuit, United States v. Johnson, 743 F.3d 270, 275 (4th Cir. 2013), stands for the proposition that "it is not relevant whether the officers proceed to take further action on the predicate traffic violation" once a vehicle is detained. However, this case is inapplicable to the one before us because in Johnson the police officer actually observed and testified to unlawful conduct amounting to probable cause (driving with an illegible license plate in violation of Maryland law) prior to the stop. Conversely, in this case, Officer Richards only observed wholly lawful conduct and surrounding circumstances that fall far short of suggesting that any criminal activity was afoot prior to initiating the stop.

- 16 -

from which reasonable suspicion of criminal activity can be inferred, and the parking pass, in its capacity as an exhibit, does nothing to overcome that failure.

Officer Richards made no effort whatsoever to investigate the "criminal activity" he asserted to be the basis for the stop. Instead, Officer Richards testified that the only reason he stopped the vehicle was because he observed "a dangling object."[27] Yet, Officer Richards testified that, after stopping the vehicle, he never sat in the driver's seat or otherwise made any attempt to determine if a driver could see the roadway through the windshield given the "dangling object's" size and location behind the rearview mirror. At no point was Officer Richards able to articulate any facts that, even when coupled with an examination of the pass itself and other evidence in the record, would lead to any objective belief that the "dangling object" was suspended "in such a manner as to obstruct the driver's clear view of the highway" as prohibited by Code § 46.2-1054.[28]

Despite the deficiencies in Officer Richards's testimony, the majority asserts that his testimony supplied evidence of "criminal activity" when, after being handed the parking pass as an exhibit in the trial, he noted in response to the prosecutor's abstract question that because of

---

[27] The majority contends that Officer Richards intended to "issue the driver a summons for driving without a seatbelt and for violating Code § 46.2-1054." However, Officer Richards testified that at the time of the stop, which is the point in time when the existence of reasonable suspicion is determined, the only thing he observed was the dangling object. J.A. at 28-29. Indeed, the record reflects that there was a stipulation by the parties that the dangling object was the only basis for the stop. Id.

[28] Although appellant raises no issue regarding the vagueness of the statute and thus I do not consider the applicability of our Supreme Court's decision in Tanner v. City of Virginia Beach, 277 Va. 432, 438, 674 S.E.2d 848, 852 (2009), it nevertheless seems to me that the fact that the statute suggests a subjective standard of enforcement for police officers, contributes to the majority's flawed analysis.

its opaque nature, the 3" x 5" parking pass "could [obstruct a driver's view]."[29]  Alternatively, the majority reasons that the parking pass itself supplies the missing articulated evidence of "criminal activity" despite factual findings by the trial court to the contrary.  These conclusions are inapposite to Terry and its progeny.

As to the former position advanced by the majority, the record is clear that neither Officer Richards's answer to the prosecutor's abstract question, nor the context supplied by the question itself established any facts or reasonable inferences that the parking pass and its placement in the vehicle blocked any view of the highway.  If either the answer or the context of the question had done so, the record then would at least have provided the missing evidence of criminality that the majority creates out of whole cloth.  In this case, Officer Richards articulated only facts that supported entirely lawful conduct and failed to provide any reason to suspect that criminal activity was occurring or about to occur.  Insofar as evidence of "criminal activity" provided by the parking pass itself is concerned, I believe that the unequivocal and reiterated factual findings by the trial court which consistently and repeatedly stated that the parking pass, as placed in the vehicle, would *not* obstruct the driver's view of the highway renders this portion of the majority's analysis untenable.

The majority insists that the trial court's statement, "because there is an object dangling . . . [the officer] is entitled constitutionally to investigate further" was the actual factual finding by the trial court rather than simply its legal conclusion.  In my view, the context of the trial court's words could hardly be clearer that this statement was actually an erroneous legal holding based upon the Commonwealth's equally erroneous argument that the mere fact that any object

---

[29] On redirect, the attorney for the Commonwealth handed the parking pass to Richards and asked, "So it's not clear that you can't—you can't see through it, so it could obstruct a driver's view?"  Officer Richards replied, "It could, yes, ma'am."

was suspended from the rearview mirror, was *per se* sufficient reasonable suspicion of criminal activity to justify the seizure of the vehicle and its occupants.

The majority generally dismisses all of the trial court's statements regarding the parking pass as "the judge's off-the-cuff remarks from the bench." However, immediately following Officer Richards's testimony, and in response to the prosecutor's argument that reasonable suspicion exists to stop the car because there is an object hanging from the mirror that "does obstruct and you can't see through it," the trial court responded,

> I will say this to you Ms. Pleas [prosecutor], I think you can hang this [parking pass] on any car in America, and it won't obstruct the view at all. It hangs up on the rearview mirror, which is up here. That doesn't obstruct your view. You don't even see the highway up there. The highway is out here. It doesn't obstruct your view at all. But that's not even the question. Now – but that's not even the question – the question in the case is whether there is reasonable suspicion that the object could obstruct the view. Because it doesn't – I'm trying whether the officer could believe it. And I think it's not an obvious answer to that.

J.A. at 34-35. Contrary to the assertion of the majority, the trial court's subsequent erroneous legal holding does not nullify or "supersede" its factual findings that the parking pass would not obstruct the view of the driver "on any car in America." Such a conclusion would fly in the face of well-settled law in Virginia that mandates this Court evaluate a trial court's fact-finding through a wholly distinct lens than a trial court's conclusions of law. Indeed, in a Fourth Amendment case, this Court must evaluate both the factual findings and conclusions of law of the trial court. In such a scenario, this Court gives "deference to the factual findings of the trial court" and "independently determine[s]" whether those findings satisfy the requirements of the Fourth Amendment. Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003). "There is good reason for the rule that appellate courts must defer to the factual findings of the trial judge in Fourth Amendment cases. The fact patterns in such cases arrive in

infinite variety, seldom or never exactly duplicated." Malbrough v. Commonwealth, 275 Va. 163, 171, 655 S.E.2d 1, 5 (2008).

The factual statements of the trial court regarding the parking pass support only the legal position advanced by the Commonwealth and ultimately adopted by the trial court, that *all* objects suspended from a rearview mirror *per se* provide reasonable suspicion to detain a vehicle's occupants. The majority overcomes this logical deficiency by recasting the trial court's legal conclusion that "an object dangling . . . [entitles the officer] constitutionally to investigate further" as a factual finding that the pass obstructs a driver's view of the highway. However, such recasting is outside the proper role of an appellate court. See Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006) ("We review the factfinding of a lower court 'with the highest degree of appellate deference.'"); see also Commonwealth v. Hilliard, 270 Va. 42, 49-50, 613 S.E.2d 579, 584 (2005) (An appellate court reviews the trial court's "findings of historical fact only for clear error and must give deference to the inferences that may be drawn from those factual findings."). As such, this Court is bound by the repeated factual findings of the trial court that the parking pass did not, and would not obstruct the view on "any car in America."

## II. The Officer's Mistake of Law

Officer Richards's failure to investigate the criminal activity suspected here is also fatal to a Fourth Amendment analysis.[30] Investigation of the suspected criminal activity is the only

---

[30] The majority asserts that appellant never raised this issue on appeal. However, appellant clearly challenges the stop of the vehicle, arguing that reasonable suspicion did not exist to justify the Terry stop under the Fourth Amendment. The law is abundantly clear that "reasonable suspicion" must be related to whether criminal activity is afoot. As such, it is proper and necessary for this Court's analysis to determine if the seizure was conducted in a manner to confirm or dispel suspicion of a violation of Code § 46.2-1054, which should have been the ultimate objective of a Terry stop. Therefore, the assignment of error on appeal fairly encompasses the basis for the stop, the failure to effectuate the purpose of the stop and any mistake of law upon which "reasonable suspicion" was supposedly based.

rationale for a detention under Terry. It is axiomatic that if an officer takes no action to confirm or dispel the suspicion of criminal activity, the detention is unwarranted. Moreover, while pretextual stops are permissible under the Supreme Court's holding in Whren v. United States, 517 U.S. 806 (1996), that is only so if probable cause exists that an offense has been committed. Thus, even though the offense for which probable cause exists is a pretext for the real reason for the detention, the existence of probable cause for *any* offense, satisfies the Fourth Amendment. Here, there is no suggestion of probable cause for any offense whatsoever and therefore any detention that does not serve the limited purpose of a Terry stop, is necessarily unconstitutional.[31]

It is also obvious to me, as it was to the trial court, that Officer Richards never investigated the "criminal activity" he asserted was afoot because he mistakenly believed that *any* object suspended from the interior of a vehicle violated the law. The trial court asked counsel "Is it of any probative value that the officer never inquired as to whether – never even looked to see whether the object, in fact obstructed the highway?" J.A. at 47. The trial court then noted, "Listening to [Officer Richards] answering the questions, this was a stop because of the existence of a dangling object. That's what the officer did. And he – and I'm not claiming bad faith. It may be a misapprehension of the law." J.A. at 51. "[Officer Richards] didn't have any idea that this [object] needed to be an obstruction." J.A. at 52.

Significantly, the trial court then asked the prosecutor, "Is it the Commonwealth's position that *any* object that dangles gives rise to the stop of the vehicle?" The prosecutor responded in the affirmative, and the trial court noted "I think you've got to get there. I think

---

[31] I am not suggesting, however, that a *valid* Terry stop does not prevent a law enforcement officer from generally investigating any and all possible criminal activity that a reasonable officer would suspect given the circumstances, including requesting consent to conduct a search.

that's what you've got to argue." "[S]o the issue becomes, and where the Court has put its focus, is whether or not essentially *the mere fact of a dangling object gives the officer reasonable suspicion* to stop to determine whether or not the object, and I quote the statute '*obstructs the driver's clear view of the highway*.'" J.A. at 102 (emphasis added). The trial court ultimately and, in my view, erroneously, adopted the Commonwealth's argument as its holding, relying upon two circuit court opinions and an unpublished opinion of this Court and never considered the officer's failure to actually investigate the statutory violation as a factor in its analysis.

The Commonwealth previously maintained on brief and at oral argument before the panel, the position it took at trial and that the trial court adopted, that "dangling objects" *per se* "provide reasonable suspicion to stop any vehicle." The Commonwealth retreated from this position to the "know it when you see it" reasonable suspicion standard for the first time in oral argument before this Court sitting *en banc*, implying without overtly arguing that the trial court now was right but for the wrong reason. The majority now adopts this standard. In my view, the Commonwealth is incorrect in both its original and revisionist positions on the application of the law. Moreover, without any guidance or any limitations to lower courts or police officers, the majority's analysis amounts to choosing the latter option of overreaching hindsight in the Hobson's Choice of either agreeing with the trial court and the Commonwealth's original position that it is objectively reasonable to stop *all* motor vehicles with *any* object hanging from the mirror regardless of any possible obstruction of the view of the highway, and the alternative "we will know it when we see it" standard advanced today pursuant to *de novo* fact-finding by this Court regarding the object in question.

To be clear, a traffic stop will be deemed a reasonable "seizure" when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop. An officer need not be factually accurate in his

- 22 -

belief that a violation has occurred, but, instead, need only produce facts establishing that he *reasonably* believed a violation had taken place. Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990) (emphasis added). In order to satisfy the reasonableness requirement of the Fourth Amendment, what is necessary of "the police officer conducting a search or seizure under one of the exceptions to the warrant requirement . . . is not that they always be correct, but that they always be reasonable." Id. at 185. However, reasonableness will not normally be found in mistakes of law by a police officer.

The United States Supreme Court recently held that only *objectively reasonable* mistakes of law are acceptable excuses from strict compliance with the Fourth Amendment. Significantly, for the purposes of the analysis here, the Supreme Court rejected the proposition that a good faith mistake of law was *per se* unreasonable under the Fourth Amendment, but Chief Justice Roberts clarified that "[t]he limit is that the mistakes must be those of reasonable men." Heien v. North Carolina, 135 S. Ct. 530, 536 (2014). "An officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." Id. at 539-40. The statute in question in Heien contained confusing language, making it unclear whether only one working "stop lamp" (brake light) was required by law, especially considering another statute seemed to suggest that vehicles must have "all originally equipped rear lamps or the equivalent in good working order." Id. at 540.

Unlike the statute in Heien that involved a difficult issue of statutory interpretation well outside the ken of non-lawyer police officers, the statute at issue in this case suffers from no such infirmity. No objectively reasonable officer could sensibly conclude from a reading of Code § 46.2-1054 that an object simply hanging from the rearview mirror is unlawful, unless it also obstructs the driver's clear view of the highway. Indeed, it is evident from the totality of Officer Richards's testimony that the trial court was correct in observing that Officer Richards

- 23 -

mistakenly believed that *any* object suspended from the interior of a vehicle constituted a Class 4 misdemeanor pursuant to Code § 46.2-1054, as opposed to only those objects which are suspended "in such a manner as to obstruct the driver's clear view of the highway."

The alleged traffic infraction (merely having a parking pass suspended from the rearview mirror) that formed the basis of the stop, was at best the sort of "sloppy study" of Code § 46.2-1054 referred to by Chief Justice Roberts in Heien. To hold otherwise ignores the observation by both the majority and dissent in Heien that it would be a *rare* situation where the law is so confusing that it would be reasonable for a police officer to be unaware of it. Further, such a holding would also mean that ignorance of the plain language used in the law, as opposed to any nuanced interpretation of it, is an automatic excuse for police officers, although certainly not for those they arrest. Since Officer Richards was unable to testify to any facts, objectively viewed, that would support reasonable suspicion that the parking pass violated Virginia law, application of the Supreme Court's holding in Heien compels a conclusion that Officer Richards's objectively unreasonable mistake of law was insufficient to justify a stop under the Fourth Amendment.

Moreover, several other states with similar statutes to Code § 46.2-1054 have also held that the mere presence of dangling objects from the rearview mirror, without facts supporting an objective officer's reasonable suspicion that the object was obstructing the driver's view of the highway, violates the Fourth Amendment. See e.g. People v. Arias, 159 P.3d 134, 138-39 (Colo. 2007) (holding that a motor vehicle stop was unjustified because the officer who erroneously thought that an air freshener hanging from a rearview mirror, regardless of whether it "obstructed" the "driver's vision through any required glass equipment," was a violation of Colorado law had not testified to any facts to support an objective finding that the air freshener obstructed driver's view); People v. Cole, 874 N.E.2d 81, 87-88 (Ill. App. Ct.) (finding that a

- 24 -

motor vehicle stop was unjustified because the officer did not realize the statute required the suspended object to "materially obstruct" the driver's view and that despite the officer's mistaken interpretation of the law, was unable to articulate facts that a reasonable officer would have found to support reasonable suspicion that the defendant, who had beads hanging from his rearview mirror, was violating the law as written), cert. denied, 865 N.E.2d 971 (Ill. 2007); and State v. Cyrus, 1 A.3d 59, 68 (Conn. 2010) (holding that an officer's mistaken belief that any object hanging from the rearview mirror violated Connecticut law could not support a finding of reasonable suspicion because the officer's testimony offered no facts or any objective basis to conclude he suspected that the chain and cross hanging from the defendant's rearview mirror obstructed the driver's view or that such a belief would have been objectively reasonable).

The majority asserts that "our holding does not endorse any *per se* rule authorizing traffic stops whenever an object of any kind is observed dangling from a vehicle's rearview mirror." Yet, its analysis, failing as it does to provide any substantive guidance to police and trial courts, has the consequence of implying just the opposite—that it is nevertheless reasonable to stop *any* vehicle, *any* time, if it has *any* object suspended from the mirror or windshield. It does not matter that the object may be a parking pass, graduation tassel, GPS receiver, government issued toll transponder, or any other object no matter the size. All such vehicles may now be stopped and the occupants detained in the sure and certain knowledge that today's precedent will justify their stop despite any testimonial deficiency in the articulation of facts establishing reasonable suspicion of criminal activity, any failure to conduct an investigation into the suspected criminal activity, and even ignorance of the plain language of the statute in question by those supposed to enforce it.

### III.  The Exclusionary Rule

Although, for the reasons stated, I would hold that Mason's Fourth Amendment rights were violated when the vehicle in which he was a passenger was stopped, I cannot say based upon the record before us that the exclusionary rule requires the suppression of the evidence in this case.  See Hudson v. Michigan, 547 U.S. 586, 592 (2006) (noting that the exclusionary rule does not apply to "'every item of evidence that has a causal connection with police misconduct'" (quoting Segura v. United States, 468 U.S. 796, 829 (1984) (Stevens, J., dissenting))).  Mason had no apparent standing to object to the seizure or search of the driver, and the trial court, having denied the motion to suppress, made no determination as to whether the driver's consent to search his person, which led to the search of the car and the discovery of evidence against Mason, attenuated any illegality of the stop as it pertained to and affected Mason.  See Schenckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973) (holding that whether an individual's consent to a search was voluntary is a factual question); United States v. Seidman, 156 F.3d 542, 548 (4th Cir. 1998) (concluding that after the trial court determined that the officer entered Seidman's residence in violation of the Fourth Amendment and that Seidman voluntarily consented to the conversation with the officer, the trial court should have gone further and determined "whether the taint arising from the unlawful entry was sufficiently attenuated by the consent").

### IV.  Conclusion

Concluding as I do that the trial court erred in its holding that reasonable suspicion existed to justify the seizure of the vehicle and its occupants under the Fourth Amendment, I would reverse and remand for a new trial including a determination by the trial court regarding the applicability of the exclusionary rule if the Commonwealth is so advised.

*VIRGINIA:*

PUBLISHED

*In the Court of Appeals of Virginia on* **Tuesday** *the* **9th** *day of* **September, 2014**.

Loren Anthony Mason, Jr.,                                               Appellant,

 against                Record No. 1542-13-2
                           Circuit Court Nos. CR12-215 through CR12-217

Commonwealth of Virginia,                                            Appellee.

Upon a Petition for Rehearing En Banc

Before the Full Court

On August 15, 2014 came the appellee, by the Attorney General of Virginia, and filed a petition requesting that the Court set aside the judgment rendered herein on August 5, 2014, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof, the petition for rehearing *en banc* is granted with regard to the issue(s) raised therein, the mandate entered herein on August 5, 2014 is stayed pending the decision of the Court *en banc*, and the appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35(b). The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter. It is further ordered that the appellee shall file twelve additional copies of the appendix previously filed in this case. In addition, any party represented by counsel shall file twelve electronic copies of their brief (and the appendix, if the party filing the appendix is represented by counsel) with the clerk of this Court. The electronic copies must be filed on twelve separate CDs or DVDs and must be filed in Adobe Acrobat Portable Document Format (PDF).[1]

A Copy,
Teste:

                             Cynthia L. McCoy, Clerk
                     *original order signed by a deputy clerk of the*
By:     *Court of Appeals of Virginia at the direction*
            *of the Court*
                             Deputy Clerk

---

[1] The guidelines for the creation and submission of a digital brief package can be found at www.courts.state.va.us, in the Court of Appeals section under "Resources and Reference Materials."

COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present: Judges Humphreys, Kelsey and Petty
Argued at Richmond, Virginia

LOREN ANTHONY MASON, JR.

v.     Record No. 1542-13-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
AUGUST 5, 2014

FROM THE CIRCUIT COURT OF SUSSEX COUNTY
W. Allan Sharrett, Judge

Paul S. Roskin (Vergara & Associates, on brief), for appellant.

Kathleen B. Martin, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

Loren Anthony Mason, Jr., ("Mason") was convicted at a bench trial in the Sussex

County Circuit Court ("trial court") of distribution of marijuana, possession of a Schedule I or II

controlled substance, and possession of a Schedule I or II controlled substance with the intent to

distribute. On appeal, Mason argues that the trial court erred in denying his motion to suppress

the evidence because the Commonwealth failed to prove that the officer had a reasonable and

articulable suspicion to stop the vehicle in which Mason was riding.

I. BACKGROUND

Around 2:30 on the afternoon of March 3, 2012, Officer Willie Richards ("Officer

Richards") was parked on the side of the road operating stationary speed radar when he observed

a vehicle pass by with a "[d]angling object on the rearview mirror." Officer Richards executed a

traffic stop of the vehicle because he observed the "dangling object." He identified the driver of

the vehicle, Tony Jarrett ("Jarrett"), and "ran his information." When Officer Richards returned

to the stopped vehicle after running a search of Jarrett's information, he was going to issue

Jarrett summonses for the dangling object and failure to wear a seatbelt. However, before issuing any summonses, Officer Richards asked Jarrett if he would mind stepping out of the car. Jarrett complied. Jarrett walked to the back of the vehicle he was driving, and Officer Richards told Jarrett why he stopped him. Then Officer Richards asked Jarrett if he had any weapons on him. Jarrett said no. Officer Richards asked him "if he minded if [Officer Richards] patted him down." Jarrett said, "that's fine." Officer Richards patted Jarrett down for weapons. Officer Richards then saw a multi-colored sunglasses case sticking out of Jarrett's left rear pocket. Officer Richards asked Jarrett what was in his back pocket. Jarrett paused, pulled out the bag, and threw it on the car stating, "I'm not selling it, I'm just using it." Officer Richards opened the bag and found green leaf material inside. At that point, Officer Richards placed Jarrett in an investigatory detention and read him his <u>Miranda</u> rights. Up to this point, Mason was sitting in the front passenger seat of the vehicle. Upon the detention of Jarrett, Officer Parker, who was training under Officer Richards, pulled Mason out of the vehicle. Officer Parker checked Mason for weapons and walked him to the front of the police vehicle, parked directly behind the vehicle Jarrett and Mason were riding in.

Officer Richards began searching the stopped vehicle. Inside the vehicle, Officer Richards saw a black backpack sitting on top of a jacket in the middle of the backseat. Inside the backpack were about twenty to twenty-five individually wrapped bags in a larger bag, digital scales, cocaine, ecstasy pills, and a large amount of marijuana. After neither individual claimed ownership of the backpack, Officer Richards placed them both under arrest for possession. He searched Mason and found $3,381 in cash and a cell phone on his person.

Other evidence established that the backpack belonged to Mason. Mason filed a motion to suppress the evidence seized from the backpack, the evidence found on Mason's person, and any statements made by Mason at the time of his detention and arrest and while in the custody of

Officer Richards.  Mason argued that the stop was based solely on Officer Richards's

observation of a parking pass that hung from the rearview mirror and that Officer Richards

lacked reasonable and articulable suspicion to stop the vehicle as that concept is defined in Terry

v. Ohio, 392 U.S. 1 (1968).

With the agreement of the parties, the trial court took up the suppression motion during

the course of Mason's trial.  Officer Richards was questioned about his reason for stopping the

vehicle.  The prosecutor asked, "what brought your attention to the vehicle again?"  Officer

Richards replied, "Dangling object [sic] on the rearview mirror."  Officer Richards subsequently

agreed with Mason's counsel that the dangling object, a parking pass, would block only a small

portion of the entire windshield.  He also agreed that if a driver was looking straight ahead, the

object would not be in his field of vision at all.  There was nothing about Jarrett's driving that

made Officer Richards believe that Jarrett's view was obstructed.  The rearview mirror to which

the object was attached was in its normal position on the windshield.  Mason's counsel

introduced the object into evidence through Officer Richards—it was a 3" x 5" parking pass

issued by the Department of Defense for use at Ft. Lee, the top portion of which hooks onto the

post that holds the rearview mirror (see below).[1]

---

[1] No effort was made to render the image as actual size because we recognize that those who publish our opinions, whether in printed and bound reports or in an on-line database, will not likely reproduce any image in actual size.  We have, however, specifically noted the actual dimensions and included horizontal and vertical rulers as part of the image in the interest of maintaining contextual accuracy irrespective of future editorial decisions by others.



The trial court concluded, and both parties acknowledged, that this pass hung *behind* the rearview mirror from the driver's perspective. App. at 33-34.

On redirect, the Commonwealth asked, "So it's not clear that you can't—you can't see through it, so it could obstruct a driver's view?" Officer Richards replied, "It could, yes, ma'am." After some discussion off the record, Officer Richards was recalled and the Commonwealth resumed questioning him:

> [Commonwealth:] What about [the vehicle] caught your attention?
>
> [Officer Richards:] Just the—initially when it was coming down I was running radar, so I was watching it come down the hill to make sure it wasn't speeding. And when it got a little closer, I saw the tag on the rearview mirror.
>
> [Commonwealth:] And was it moving, or anything about it cause you concern for the driver?

[Officer Richards:]  Just that there was a dangling object.  I mean, I can't say it was moving back and forth, just that I saw it when it came by.

[Commonwealth:]  Were you able to see everything from your vantage point when you saw the vehicle with the object in the window?  Were you able to see everything in the car with that object there?

[Officer Richards:]  For the most part, yes.

[Commonwealth:]  And when you say "for the most part"?

[Officer Richards:]  I could see the two, the passenger and the driver.

[Commonwealth:]  Okay.  Once you pulled the vehicle over, did you get in the vehicle?

[Officer Richards:]  Get in it?

[Commonwealth:]  Yes, the stopped vehicle?

[Officer Richards:]  Eventually, yes, ma'am.

[Commonwealth:]  And did you look at the rearview mirror?

[Officer Richards:]  Yes, ma'am.

[Commonwealth:]  And what about it, if anything, did you observe?

[Officer Richards:]  Just there was a dangling object on it.

[Commonwealth:]  Did it—when you got in, were you on the driver's side or passenger's side, do you remember?

[Officer Richards:]  Well, when I went into the vehicle to search it, it was on the passenger side.

[Commonwealth:]  You got in on the passenger side?

[Officer Richards:]  Yes.

[Commonwealth:]  Did you look out of the window?

[Officer Richards:]  No, ma'am.  Not to see—not to determine, you know, whether I could see out of the window or not where the dangling object was, no, ma'am.

[Commonwealth:]  So you didn't look?

[Officer Richards:]  No.

Mason's counsel renewed his motion "even more strenuously" based on Officer Richards's testimony that the stop was based on the dangling object, and not because the officer thought the object was in any way obstructing the driver's view.  The Commonwealth's position in response was that any object that dangles from the rearview mirror justifies the stop of the vehicle.

Throughout its deliberation over the motion and extensive discussions with the parties, the trial court consistently and repeatedly stated that the parking pass would not obstruct the driver's view of the highway.  For example, the trial court found that the parking pass would not obstruct the view of the driver at all if hung "on any car in America."  "I don't think it obstructs anybody's view."  "It seems to me that object hanging from the mirror—it's readily obvious, it's not obstructing anybody's view."  "It hangs up in the rearview mirror, which is up here.  That doesn't obstruct your view.  You don't even see the highway up there.  The highway is out here.  It doesn't obstruct your view at all."  "The object that dangled didn't substantially obstruct a view.  You could get in the car and essentially look right through it.  But it did dangle down and it was there."  The trial court simultaneously and repeatedly acknowledged that the issue, however, was whether the object gave rise to reasonable suspicion to believe that a traffic infraction was taking or had taken place.  The trial court ordered additional briefing by the parties on this issue and continued the matter for further consideration of the issue.  When the parties reconvened several months later, the trial court repeated that "I think everyone would agree that [the parking pass] didn't substantially obstruct the driver's view" and then noted that

- 6 -

the issue was "whether or not essentially the mere fact of a dangling object gives the officer reasonable suspicion to stop to determine whether or not the object . . . obstructs the driver's clear view of the highway." The trial court then held that there is reason to believe that the object could be blocking the sight of the driver simply "because there is an object dangling." The trial court continued, "[The officer] is entitled constitutionally to investigate further. So the Court believes that the presence of the object is, in fact, sufficient reasonable suspicion to justify a detention of the vehicle." The trial court denied the motion to suppress the evidence and found Mason guilty as charged.

## II. ANALYSIS

Mason argues on appeal that "the trial court erred in failing to grant [his] motion to suppress controlled substances seized by Officer Richards of the Waverly Police Department when the Commonwealth failed to meet its burden in showing that he had reasonable and articulable suspicion to stop the vehicle in which Loren Mason was riding."

Officer Richards pulled the vehicle over after observing an object attached to the rearview mirror. Code § 46.2-1054 provides in part,

> It shall be unlawful for any person to drive a motor vehicle on a highway in the Commonwealth with any object or objects, other than a rear view mirror, sun visor, or other equipment of the motor vehicle approved by the Superintendent, suspended from any part of the motor vehicle *in such a manner as to obstruct the driver's clear view of the highway through the windshield*.

(Emphasis added).

On appeal, it is the appellant's burden to show that the trial court's denial of a motion to suppress constituted reversible error. Lovelace v. Commonwealth, 37 Va. App. 120, 124, 554 S.E.2d 688, 689 (2001). "[D]eterminations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." Ornelas v. United States, 517 U.S. 690, 699 (1996). "In performing such analysis, we are bound by the trial court's findings of historical fact unless

'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee v. Commonwealth, 25 Va. App. 193, 198, 497 S.E.2d 259, 261 (1997) (en banc).

### A.  Code § 46.2-1054 does not Proscribe *All* Suspended Objects

Initially, we note that both at trial and on appeal, the Commonwealth advanced its position that *any* object suspended from a rearview mirror would provide an officer with reasonable suspicion to justify pulling the car over and this argument was ultimately adopted by the trial court in its holding.  However, Code § 46.2-1054 proscribes only suspended objects that *obstruct the driver's clear view of the highway*.  What exactly constitutes an obstruction of the clear view of the highway is not specified by the statute.  However, appellant raises no issue regarding the vagueness of the statute and its constitutionality is presumed, thus we do not consider the applicability of our Supreme Court's decision in Tanner v. City of Virginia Beach, 277 Va. 432, 438, 674 S.E.2d 848, 852 (2009).  What is clear is that the statute does not proscribe *all* objects suspended from the interior of a motor vehicle.  If the General Assembly had intended to proscribe all objects suspended from any part of a motor vehicle, it would have said so.  See Holsapple v. Commonwealth, 266 Va. 593, 599, 587 S.E.2d 561, 564-65 (2003) (courts may not add language to a statute that the General Assembly has not seen fit to include).  Thus, and as discussed more fully *infra*, in order for an officer to have reasonable suspicion that a driver is violating Code § 46.2-1054, the evidence must support an officer's reasonable suspicion that a suspended object is obstructing the driver's view of the road and not merely that there is a suspended object.  A holding along the lines urged by the Commonwealth that any and all objects suspended from a mirror in a motor vehicle provide reasonable suspicion that the driver is violating Code § 46.2-1054, would amount to a *per se* rule obviating the need for *particularized* suspicion that an individual is engaged in wrongdoing before executing a Fourth

Amendment stop and detention.  See United States v. Cortez, 449 U.S. 411, 417-18 (1981).  The

United States Supreme Court has said that "for the most part *per se* rules are inappropriate in the

Fourth Amendment context."  United States v. Drayton, 536 U.S. 194, 201 (2002) (favoring

consideration of the totality of the circumstances of the encounter when determining if a citizen

has been seized by police).  The *per se* rule urged by the Commonwealth would stand in stark

contrast to the established precedent of the United States Supreme Court requiring an officer to

form individualized suspicion that a crime is being or is about to be committed and we reject the

Commonwealth's argument supported by the dissent that the statute permits every vehicle with

any object suspended from the rearview mirror to be stopped based solely because of that fact.[2]

Thus, we turn to whether the totality of the circumstances of *this* case provide reasonable

suspicion of criminal activity for the stop of the vehicle.

B.  Reasonable Suspicion and the Requirement that Facts Supporting it be Articulated

We begin, as we must in these cases, with the Fourth Amendment to the United States

Constitution, which provides that "the right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures, shall not be violated."

> It is quite plain that the Fourth Amendment governs "seizures" of
> the person which do not eventuate in a trip to the station house and
> prosecution for crime—"arrests" in traditional terminology.  It
> must be recognized that whenever a police officer accosts an

---

[2] The obvious legislative purpose behind Code § 46.2-1054 is a recognition that many who drive motor vehicles on the highways of the Commonwealth attach different objects and devices to their vehicles for various reasons.  Some are purely decorative such as the iconic "fuzzy dice" or hold personal or sentimental meaning such as a graduation tassel or rosary beads, while still other objects have utilitarian uses such as GPS devices, toll transponders, air fresheners or, as in this case, parking permits.  Significantly, these items are permitted to be attached to a vehicle *unless* they are of a size or positioned in such a way as to impair the ability of the driver to view the road.  Were we to adopt the interpretation advanced by the Commonwealth and supported by the dissent, *all* who do so would automatically provide police with a reasonable suspicion to detain them without regard to whether there is any evidence articulated by the officer that the article in question may actually be a hazard to the operation of the vehicle.

- 9 -

individual and restrains his freedom to walk away, he has "seized" that person.

Terry, 392 U.S. at 16. "Prior to Terry v. Ohio, any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause." Florida v. Royer, 460 U.S. 491, 498 (1983). "Terry created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." Id.

Even a cursory review of reasonable suspicion cases reveals often repeated language requiring specific facts in support of an officer's suspicion that criminal activity is afoot. "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989). "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. "A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion." Sokolow, 490 U.S. at 10; see also United States v. Dennis, 115 F.3d 524, 532 (7th Cir. 1997) ("[I]n reviewing a reasonable suspicion determination, we require law enforcement authorities to articulate the specific characteristics exhibited by the person or object to be detained which aroused the authorities' suspicion in the particular case before us, and we determine whether those characteristics would reasonably arouse suspicion under the circumstances presented in the case." (citing Sokolow, 490 U.S. at 10)). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" Sokolow, 490 U.S. at 7 (quoting Terry, 392 U.S. at 27); see also Rudolph v. Commonwealth, 277 Va. 209, 210, 722 S.E.2d 527, 528 (2009) ("To establish reasonable suspicion, an officer must be able to articulate

more than an unparticularized suspicion or 'hunch' that criminal activity is afoot."). "This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." Terry, 392 U.S. at 21 n.18.[3]

A reviewing court must consider the totality of the circumstances known to the officer at the time of the stop when determining whether the officer's suspicion was reasonable:

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: *would the facts available to the officer at the moment of the seizure* or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.

Terry, 392 U.S. at 21-22 (emphasis added). "[T]he totality of the circumstances – the whole picture – must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Cortez, 449 U.S. at 417-18; see also Navarette v. California, 134 S. Ct. 1683, 1687 (2014) (the Fourth Amendment permits traffic stops "when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity'" (quoting Cortez, 449 U.S. at 417-18); and holding that a tipster can provide an officer

---

[3] "The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle . . . . An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." Cortez, 449 U.S. at 417 (citations omitted); see also Delaware v. Prouse, 440 U.S. 648, 663 (1979) (stopping an automobile and detaining the driver is unreasonable under the Fourth Amendment unless there is at least articulable and reasonable suspicion that the vehicle or an occupant is subject to seizure for violation of the law). When a police officer makes a traffic stop, the passenger is seized within the meaning of the Fourth Amendment and may challenge the constitutionality of the stop. Brendlin v. California, 551 U.S. 249, 251 (2007).

with enough particular facts to give rise to the officer's reasonable suspicion); United States v. Edmonds, 240 F.3d 55, 59 (D.C. Cir. 2001) ("the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them").

In Sibron v. New York, 392 U.S. 40 (1968), a companion case to Terry, the Court considered whether the officer had reasonable grounds to believe that Sibron was armed and dangerous, so as to justify the officer's self-protective search for weapons. "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." Id. at 64. "In the case of the self-protective search for weapons, *he must be able to point to particular facts* from which he reasonably inferred that the individual was armed and dangerous." Id. (emphasis added) (citing generally Terry, 392 U.S. 1). The Court found that the officer's testimony revealed no such facts—the officer did not testify that when Sibron put his hand in his pocket that he feared that Sibron was going for a weapon, and he "never at any time put forth the notion that he acted to protect himself." Id. at 64 n.21. The Court found that the trial court should have suppressed the evidence found in the officer's search of Sibron. Id. at 68.

In Brown v. Texas, 443 U.S. 47 (1979), the Court found that the officer failed to articulate a reasonable suspicion for stopping Brown. Officers observed Brown and another man walking away from one another in an alley. Officer Venegas testified that he and the other officer "believed the two had been together or were about to meet until the patrol car appeared." Id. at 48. The officers then stopped Brown because the situation "looked suspicious and [they] had never seen [Brown] in the area before." Id. at 49. The area was known for drug trafficking, however, "the officers did not claim to suspect [Brown] of any specific misconduct, nor did they

have any reason to believe that he was armed." Id. The Court noted in its analysis that "none of the circumstances preceding the officers' detention of [Brown] justified a reasonable suspicion that he was involved in criminal conduct." Id. at 51-52. "Officer Venegas testified at appellant's trial that the situation in the alley 'looked suspicious,' but he was unable to point to any facts supporting that conclusion." Id. at 52. The Court noted that in this case the officer's testimony "is to be distinguished from the observations of a trained, experienced police officer who is able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." Id. at 52 n.2. "In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference." Id. at 52. "When . . . a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits." Id.

Likewise, in this case, Officer Richards did not testify either to facts sufficient to suspect the driver or Mason of any specific misconduct or reasons why his training and experience would permit further investigation of conduct which to the untrained eye appears to be wholly innocent. Although the prosecutor asked Officer Richards if anything about the dangling object concerned him, his response was "just that there was a dangling object."[4] We note that in some cases, "'wholly lawful conduct might justify the suspicion that criminal activity was afoot.'" Sokolow, 490 U.S. at 9 (quoting Reid v. Georgia, 448 U.S. 438, 441 (1980)). However, in determining whether the officer's suspicions were reasonable the relevant inquiry is the degree of suspicion that attaches to particular types of noncriminal acts. Id. at 10.

---

[4] Although we do not consider it in our reasonable suspicion analysis, we note that Officer Richards did not pursue any investigation of his stated reason for the stop to see if the parking pass actually obstructed the driver's view of the road from inside the car.

In <u>Reid v. Georgia</u>, 448 U.S. 438 (1980), the Supreme Court determined that federal narcotics agents seized Reid without an articulable suspicion that he was unlawfully transporting drugs—Reid's conduct was mostly typical of any number of innocent travelers and the individual conduct specific to Reid was not indicative of any wrongdoing. The evidence at the suppression hearing established that Reid arrived at the Atlanta Airport on an early morning flight from Fort Lauderdale, Florida. <u>Id.</u> at 439. The agent testified that Fort Lauderdale is a principal place of origin of much of the cocaine sold in the country. <u>Id.</u> at 441. As Reid proceeded through the airport, the agents observed him looking backward in the direction of a second man. <u>Id.</u> at 439. Both men carried similar shoulder bags. The men walked past the baggage claim, then spoke briefly, and left the terminal building together; at this point agents stopped them and found drugs in Reid's bag. <u>Id.</u> The Court of Appeals of Georgia found that the agents had reasonable suspicion of Reid's wrongdoing because (1) Reid arrived from a city known for its cocaine production, (2) Reid arrived "early in the morning, when law enforcement activity is diminished," (3) Reid and his associate "appeared to the agent to be trying to conceal the fact that they were traveling together," and (4) they only carried shoulder bags and no other luggage. <u>Id.</u> at 440-41.

However, the United States Supreme Court reversed and concluded that "the agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances." <u>Id.</u> at 441. Of the evidence relied on, only the fact that petitioner occasionally looked back toward his associate relates to his particular conduct. <u>Id.</u> "The other circumstances describe a very large category of presumable innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation

as there was in this case could justify a seizure." Id.[5] Nor could the Court agree that the manner in which Reid and his associate walked through the airport "reasonably could have led the agent to suspect them of wrongdoing"—this was "simply too slender a reed to support the seizure in this case." Id.

In this case, Officer Richards, the only witness who testified about the circumstances of the stop, did not articulate facts that would support any particularized suspicion that Jarrett was committing a traffic offense when he pulled the car containing Mason over. He only asserted that he observed an object hanging from the rearview mirror as the vehicle passed, and it is clear from his testimony that he mistakenly believed that *any* object hanging from the mirror constituted an offense. Officer Richards never testified to any facts or circumstances that suggested a reason to suspect that this 3" x 5" object hanging from behind a mirror affixed to the top of the vehicle's windshield obstructed the driver's view of any part of the highway. On cross-examination the officer confirmed that the only thing he knew at the point of the stop was the "dangling object." Officer Richards did not assign suspicion to this fact based on his experience as a law enforcement officer in the field. See United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1123 (9th Cir. 2002) (where the court considered that the agent never testified about the relevance of the innocent activity of the suspect or that, in his experience, the suspect's actions indicated criminal activity).

The prosecutor stipulated that Officer Richards did not notice anything unusual about the driving of the vehicle. The officer acknowledged that the parking pass would only take up a

---

[5] Similarly, the United States Court of Appeals for the Eleventh Circuit has noted that "neither police officers nor courts should sanction as 'reasonably suspicious' a combination of factors that could plausibly describe the behavior of a large portion of the motorists engaged in travel upon our interstate highways." United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir. 1990); accord United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1492 (9th Cir. 1994) (holding that reasonable suspicion cannot be based "on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped").

small portion of the entire windshield and that it would not be in a driver's view when looking straight ahead. We further note, as did the trial court, that the parking pass hung behind the rearview mirror, reducing the area of the parking pass visible to the driver. On redirect, the prosecutor asked Officer Richards, "So it's not clear that you can't—you can't see through it [meaning the parking pass], so it could obstruct a driver's view?" Officer Richards replied, "It could, yes, ma'am." Even the officer's acknowledgement in court that the pass could possibly obstruct a driver's view specifically because of its opaque nature, does not equate to never articulated facts supporting a reasonable suspicion at the time of the stop that the pass was obstructing the driver's view *of the highway*.[6] Moreover, the absence of the articulation of facts supporting a reasonable suspicion in Officer Richards's testimony is consistent with the trial court's statements after viewing the exhibit that the parking pass could not obstruct a driver's view of the highway if hung "on any car in America" and the trial court's later statement made immediately prior to its ruling that, "I think everyone would agree that [the parking pass] didn't substantially obstruct the driver's view."[7]

---

[6] This is the central point of our disagreement with the dissent. A highway includes "the *entire width between the boundary lines* of every way or place open to the use of the public for purposes of vehicular travel in the Commonwealth, including the streets and alleys." Code § 46.2-100. Barring the approach advocated by the Commonwealth and the dissent that *any* object affixed to the interior of a vehicle *per se* generates reasonable suspicion as a matter of law, neither the testimony of Officer Richards nor the parking pass itself, provides reason to believe that the trial court's unequivocal and repeated statements regarding this object's inability, from its size and location in the vehicle, to obstruct *any* part of the highway were either nonsense or legally meaningless.

[7] This latter statement by the trial court immediately prior to its holding seems to us to contradict the dissent's assertion that "none of the judge's initial remarks can be fairly deemed a 'factual finding.'" Indeed, and significantly unlike the situation in Commonwealth v. Bryant, No. 0076-04-1, 2004 Va. App. LEXIS 283, at *4 (Va. Ct. App. June 15, 2004), cited by the dissent, we conclude that these two unequivocal statements by the trial court are indeed a factual finding binding upon this Court and the holding the dissent contends is a repudiation of these statements is actually an erroneous adoption by the trial court of the Commonwealth's legal argument that *any* opaque object attached to a vehicle constitutes reasonable suspicion of a violation of Code § 46.2-1054 and justifying a stop of the vehicle.

Officer Richards's observation of the parking pass attached to the rearview mirror is descriptive of wholly innocent behavior exhibited by many drivers on the road who have objects attached to their windshield or rearview mirror that do not obstruct their view of the road. We note that there is little distinction between the size of the parking pass, which when hanging would be covered in part by the rearview mirror itself, and the size of various opaque stickers and other objects that various government agencies require or authorize to be displayed on the windshield of a motor vehicle, such as a state vehicle inspection sticker, Code § 46.2-1163, or an E-ZPass toll transponder, Code § 33.1-23.03:10(C). Without any particular or individualized facts suggesting or supporting a suspicion that this parking pass was obstructing the driver's view of the road, we conclude that the totality of the circumstances known to the officer at the time of the stop in this case are insufficient to support a reasonable suspicion that the driver was violating the law.

III. CONCLUSION

We hold that the traffic stop and seizure of Mason violated his Fourth Amendment rights because the facts and circumstances available to the officer at the time of the stop did not support a reasonable suspicion that the driver was violating or about to violate the law. However, despite our holding that the stop here is constitutionally infirm, we cannot say based upon the record before us that the exclusionary rule necessarily requires the suppression of the evidence in this case. See Hudson v. Michigan, 547 U.S. 586, 592 (2006) (the exclusionary rule does not apply to "'every item of evidence that has a causal connection with police misconduct'" (quoting Segura v. United States, 468 U.S. 796, 829 (1984) (Stevens, J., dissenting))). The trial court, having denied the motion to suppress, made no determination as to whether Jarrett's consent to search his person, which led to the search of the car and the discovery of evidence against Mason, attenuated the illegality of the stop as it pertained to and affected Mason. See

Schenckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973) (whether an individual's consent to a search was voluntary is a factual question); United States v. Seidman, 156 F.3d 542, 548 (4th Cir. 1998) (after the trial court determined that the officer entered Seidman's residence in violation of the Fourth Amendment and that Seidman voluntarily consented to the conversation with the officer, the trial court should have gone further and determined "whether the taint arising from the unlawful entry was sufficiently attenuated by the consent"). Therefore, we reverse and remand for a new trial consistent with this opinion if the Commonwealth is so advised.

Reversed and remanded.

KELSEY, J., dissenting.

The case is important not because I think it is a good or bad policy to stop vehicles for what some consider to be an insignificant vehicular safety violation, but because I disagree with the majority's factual narrative and believe that much of the majority's legal analysis is out of sync with settled precedent.

I.

I will restate the facts as I believe we must — "in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences." Glenn v. Commonwealth, 49 Va. App. 413, 416, 642 S.E.2d 282, 283 (2007) (*en banc*) (internal quotation marks omitted), aff'd, 275 Va. 123, 654 S.E.2d 910 (2008).

A police officer testified that, while operating stationary radar, he saw "a vehicle that came by with a dangling object." App. at 21. The object was dangling from the rearview mirror. Id. at 22. At the suppression hearing, the officer identified the object that he observed. It was an opaque parking pass, measuring five inches long and three inches wide. The parking pass was introduced as an exhibit at the suppression hearing. The officer testified that he "saw it *clearly*" as the vehicle "went by" him. Id. at 31 (emphasis added). Two questions later, when asked if the dangling parking pass that he so clearly observed "could obstruct a driver's view," the officer said unequivocally, "*It could, yes, ma'am*." Id. (emphasis added).

At the suppression hearing, the trial judge made various remarks from the bench suggesting his inclination to grant the motion to suppress. After making these remarks, however, the judge requested briefing and "asked for additional time to consider" the issue. Id. at 101. The trial judge also later examined the parking pass and took a "view of the scene," id., to determine if the parking pass could obstruct a driver's vision in a vehicle similar to the one that

- 19 -

the officer had stopped.  <u>See</u> Oral Argument Audio at 9:47 to 9:55, 26:04 to 26:30 (stipulation of counsel).  The parking pass, reproduced in its actual size, looks like this:



Later, on the day of trial, the judge advised counsel that he had reconsidered his earlier remarks during the suppression hearing.  He said that his initial "concern" was that the parking pass did not "*substantially* obstruct" the driver's view of the highway.  App. at 102 (emphasis added).  But after reviewing the caselaw "stacked up against me," the judge explained, he realized that neither the statute nor the reasonable suspicion standard required a *substantial* obstruction.  <u>Id.</u> at 105.  He noted that one of the cases making this point was an unpublished opinion from our Court, <u>Commonwealth v. Bryant</u>, No. 0076-04-1, 2004 Va. App. LEXIS 283, at *4 (Va. Ct. App. June 15, 2004) (Humphreys, J.).

In Bryant, we *reversed* a trial court for granting a suppression motion in a similar context. There, an officer stopped a vehicle after observing an "air freshener hanging from the rear view mirror" that the officer believed "could" have partially obstructed the driver's view. Id. (internal quotation marks omitted). Considerably smaller than the opaque parking pass in our case, the air freshener in Bryant was "in the shape of a dragon" and was "three-and-a-half by one-and-a-half inches." Id. at *5 (internal quotation marks omitted). Under these facts, we held that the trial court plainly erred by concluding that these facts did not give rise to a reasonable suspicion that the vehicle could have been in violation of Code § 46.2-1054. Id. at *15-16; see also Richardson v. Commonwealth, No. 0946-13-3, 2014 Va. App. LEXIS 98, at *4 (Va. Ct. App. March 18, 2014) (Huff, J.) (upholding a traffic stop where the officer observed that an "air freshener could be in violation of Virginia's 'obstruction of view' statute").

The trial judge also relied upon Pegram v. Commonwealth, No. 1041-95-2, 1996 Va. App. LEXIS 611, at *4 (Va. Ct. App. Sept. 24, 1996) (Willis, J.), in which we similarly noted that an officer had "stopped the vehicle based upon his belief that it was being operated in violation of Code § 46.2-1054." The object in that case was a "large cloth object" hanging from the mirror. Id. at *2. We held that even though the officer was unable "to describe the cloth," that "d[id] not invalidate the stop." Id. at *4. To the contrary, "[b]ecause [the officer] had probable cause to believe that the cloth object violated Code § 46.2-1054, the trial judge did not err in finding that the [officer] had authority to stop the vehicle and to issue a summons." Id.

Acknowledging that he "initially disagreed" with the view taken by these cases, the trial judge explained that "what carrie[d] the day" was the "definition" of obstruction. App. at 105. "[U]ltimately it's the definition that persuaded the Court that that's what the law is intended and that's what the law says." Id. at 105. Repudiating his earlier views, the trial judge held:

- 21 -

[T]he Court is of the opinion that the standard for [the officer] to have stopped the vehicle was[,] is there *reasonable suspicion* that this object is blocking or cutting off from sight or blocking an unhampered, . . . unrestricted *view of the highway*? Well, *there is reason to believe that it could be*, because there is an object dangling. He is entitled constitutionally to investigate further. So the Court believes that the presence of the object is, in fact, sufficient reasonable suspicion to justify a detention of the vehicle.

Id. (emphasis added).[8] It is the court's holding — not the judge's initial remarks from the bench — that accompanies the final order on appeal to us. Viewed in context, none of the judge's initial remarks can be fairly deemed a "factual finding." *Ante* at 16 n.7.[9] Nor should they be woven into a factual narrative as if they were.

## II.

### A. THE REASONABLE SUSPICION STANDARD

Reasonable suspicion is simply suspicion that is reasonable. It is not something more than suspicion. And it can hardly be called proof. To be sure, the degree of certitude required by reasonable suspicion is "'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less demanding than that for probable cause.'" Perry v. Commonwealth, 280 Va. 572, 581, 701 S.E.2d 431, 436 (2010) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)); see also Navarette v. California, 134 S. Ct. 1683, 1687 (2014). Consequently, "the mere possibility of an innocent explanation does not necessarily exclude a

---

[8] See also App. at 40-41 (The trial judge confirmed that "the question we have now is [whether there] is reasonable suspicion to believe that there is a traffic infraction taking place[.] So again, is there reasonable suspicion to believe that [the parking pass] is obstructing . . . the driver's *clear view of the highway through the windshield*?" (emphasis added)).

[9] We traditionally decline invitations to "fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied." Damon v. York, 54 Va. App. 544, 555, 680 S.E.2d 354, 360 (2009) (internal quotation marks omitted); see also White v. White, 56 Va. App. 214, 217-18, 692 S.E.2d 289, 291 (2010) ("We are particularly skeptical . . . of appellate efforts to piece together . . . fragmented remarks from the bench" in an effort to undermine the court's ultimate holding.).

reasonable suspicion that the suspect might be violating the law." Morris v. City of Va. Beach, 58 Va. App. 173, 183, 707 S.E.2d 479, 483 (2011) (internal quotation marks omitted).

No one can be arrested on the basis of reasonable suspicion. It serves merely to justify a brief detention to investigate. Because the need for justification is quite low, so too is the justifying legal standard. See 4 Wayne R. LaFave, Search & Seizure § 9.5(b), at 658-59 (5th ed. 2012) (noting that reasonable suspicion requires merely "that there exists at the time of the stop a substantial possibility — or, indeed, *even a 'moderate chance'* — that [unlawful] conduct has occurred, is occurring, or is about to occur" (emphasis added) (footnotes omitted) (quoting Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 371 (2009))).

In suppression hearings, a police officer usually takes the stand and describes *what* he saw and, occasionally, *why* he did what he did. While the first part is highly relevant, the second is not. When assessing the legality of an officer's actions, his "subjective motivation is irrelevant." Robinson v. Commonwealth, 273 Va. 26, 37, 639 S.E.2d 217, 223 (2007) (quoting Brigham City v. Stuart, 547 U.S. 398, 404 (2006)). A police officer's "action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify the action.'" Stuart, 547 U.S. at 404 (brackets omitted) (quoting Scott v. United States, 436 U.S. 128, 138 (1978)); see also Navarette, 134 S. Ct. at 1687. Indeed, settled precedent governing Fourth Amendment cases has "repeatedly rejected a subjective approach." Fernandez v. California, 134 S. Ct. 1126, 1134 (2014) (internal quotation marks omitted).

Put another way, a court should thus make "'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken." Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (quoting Scott, 436 U.S. at 136). Consequently, an "officer's

*subjective characterization* of observed conduct is *not relevant*" to an objective application of the Fourth Amendment. Jones v. Commonwealth, 279 Va. 665, 673, 691 S.E.2d 801, 805 (2010) (emphasis added and internal quotation marks omitted); see also Stuart, 547 U.S. at 404.[10]

It necessarily follows that, when deciding a suppression motion, a court should *not* limit itself "to what the stopping officer says or to evidence of his subjective rationale," Raab v. Commonwealth, 50 Va. App. 577, 583 n.2, 652 S.E.2d 144, 148 n.2 (2007) (*en banc*) (quoting United States v. Brown, 232 F.3d 589, 594 (7th Cir. 2000)).[11] Courts should instead "look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious." LaFave, *supra*, § 9.5(a), at 647 n.22 (quoting United States v. McKie, 951 F.2d 399, 402 (D.C. Cir. 1991)). Because the reasonable suspicion test "is *purely* objective," the Terry standard imposes "no requirement that an *actual suspicion* by the officer be shown." Id. § 9.5(a), at 647 (second emphasis added).

Citing United States v. Sokolow, 490 U.S. 1 (1989), the majority asserts that an officer making a Terry stop must actually *articulate* the articulable facts that gave rise to *his* personal suspicion. Sokolow does not stand for that proposition. Nor do any of the other cases cited by the majority opinion. Sokolow simply restates that the "totality of the circumstances," id. at 8 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)), must give rise to "articulable facts that criminal activity 'may be afoot,'" id. at 7 (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)).

___

[10] See also Bond v. United States, 529 U.S. 334, 338 n.2 (2000); Whren v. United States, 517 U.S. 806, 813 (1996); Scott, 436 U.S. at 138; United States v. Johnson, 734 F.3d 270, 275 (4th Cir. 2013); United States v. Singh, 363 F.3d 347, 356 (4th Cir. 2004); United States v. McKie, 951 F.2d 399, 402 (D.C. Cir. 1991); Harris v. Commonwealth, 276 Va. 689, 697, 668 S.E.2d 141, 146 (2008); Robinson, 273 Va. at 37-38, 639 S.E.2d at 223-24.

[11] See also Washington v. Commonwealth, 60 Va. App. 427, 434, 728 S.E.2d 521, 525 (2012); Shifflett v. Commonwealth, 58 Va. App. 732, 736 n.2, 716 S.E.2d 132, 135 n.2 (2011); Morris, 58 Va. App. at 179, 707 S.E.2d at 481; Thomas v. Commonwealth, 57 Va. App. 267, 273-75, 701 S.E.2d 87, 90-91 (2010); Armstead v. Commonwealth, 56 Va. App. 569, 579 n.7, 695 S.E.2d 561, 565 n.7 (2010).

This does not mean that the facts must actually be articulated by the officer on the witness stand or that any such articulation, by itself, must be sufficient to establish reasonable suspicion. The majority's assertion to the contrary is inconsistent with binding *en banc* precedent from our Court, Raab, 50 Va. App. at 583 n.2, 652 S.E.2d at 148 n.2,[12] as well as the uniform view among courts that have addressed this issue.[13]

### B. OBSTRUCTING A DRIVER'S "CLEAR VIEW" OF THE HIGHWAY

As a provision of the Virginia Motor Vehicle Code, Code § 46.2-1054 prohibits, among other things, any object from being "suspended from any part of the motor vehicle in such a manner as to obstruct the driver's clear view of the highway through the windshield, the front side windows, or the rear window." This portion of the statute has three components: (i) something "suspended," (ii) that serves to "obstruct" a "clear view" of the highway, (iii) through any window of the vehicle (except for the rear side windows). Id.

By statute, a highway includes "the *entire width between the boundary lines* of every way or place open to the use of the public for purposes of vehicular travel in the Commonwealth, including the streets and alleys." Code § 46.2-100 (emphasis added). A highway is not — as Mason presumes — simply the stretch of pavement immediately in front of a driver's vehicle. Under Virginia law, a "highway" is not limited "to a hard-surfaced or partly hard-surfaced way

---

[12] The "interpanel accord doctrine" precludes a panel of our Court from altering the holding of a prior panel, Startin v. Commonwealth, 56 Va. App. 26, 39 n.3, 690 S.E.2d 310, 316 n.3 (2010) (*en banc*) (citing Atkins v. Commonwealth, 54 Va. App. 340, 343 n.2, 678 S.E.2d 834, 835 n.2 (2009)), aff'd, 281 Va. 374, 706 S.E.2d 873 (2011). All the more, the doctrine precludes a panel from expressly or implicitly repudiating a prior *en banc* holding.

[13] See, e.g., United States v. Bailey, 622 F.3d 1, 5-6 (D.C. Cir. 2010); Brown, 232 F.3d at 594; United States v. Ozbirn, 189 F.3d 1194, 1198-99 (10th Cir. 1999); United States v. Swann, 149 F.3d 271, 272 (4th Cir. 1998); United States v. Jones, 990 F.2d 405, 408 (8th Cir. 1993); McKie, 951 F.2d at 402; United States v. Hawkins, 811 F.2d 210, 213 (3d Cir. 1987); State v. Heminover, 619 N.W.2d 353, 357 (Iowa 2000), abrogated on other grounds by State v. Turner, 630 N.W.2d 601, 606 n.2 (Iowa 2001); Zimmerman v. N.D. Dep't of Transp. Dir., 543 N.W.2d 479, 483 (N.D. 1996).

or to a dirt and gravel way. It does not confine a highway to the main-travelled portion of the way or to lanes specifically designated for vehicular traffic." Crouse v. Pugh, 188 Va. 156, 164-65, 49 S.E.2d 421, 426 (1948); see also Jessee v. Slate, 196 Va. 1074, 1083, 86 S.E.2d 821, 826 (1955).

Because a "highway" includes the "entire width of the boundary lines" of the "way or place" used by vehicular traffic, Code § 46.2-100, it includes overhead highway signs,[14] on-ramps and off-ramps, merge lanes, deceleration lanes, roadways,[15] bridges,[16] intersections,[17] shoulders,[18] pedestrian crosswalks,[19] and shared-use paths.[20] Thus, a "clear view" of a "highway," as used in Code § 46.2-1054, no doubt means the pavement itself and everything physically on it. It would make no sense for Code § 46.2-1054 to prohibit a dangling object from

---

[14] See Code § 46.2-100 (defining a "traffic control device" as "a sign, signal, marking, or other device used to regulate, warn, or guide traffic placed on, over, or adjacent to a . . . highway").

[15] A "roadway," narrower in scope than a highway yet still broad in terms of the surface area it includes, is defined as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, exclusive of the shoulder." Code § 46.2-100. A highway may itself "include two or more roadways." Id.

[16] See Nelson v. Cnty. of Henrico, 10 Va. App. 558, 561, 393 S.E.2d 644, 646 (1990).

[17] See Code § 46.2-100 (defining "intersection" as certain areas of highways that "join one another," cross an "intersecting highway," or are crossed "by a pedestrian crosswalk").

[18] A "shoulder" is defined as "that *part of a highway* between the portion regularly traveled by vehicular traffic and the lateral curbline or ditch." Code § 46.2-100 (emphasis added); see also Jessee, 196 Va. at 1083, 86 S.E.2d at 826.

[19] See Code § 46.2-100 (defining "crosswalk" as a "part of a roadway"); see also *supra* note 17 (defining "intersection").

[20] "Shared-use paths" include bikeways and other paths that are open to "pedestrians, skaters, users of wheel chairs or wheel chair conveyances, joggers, and other nonmotorized users." Code § 46.2-100.

- 26 -

obstructing a driver's view of the pavement directly in front him but not a vehicle, bicyclist, or pedestrian[21] moving across that same pavement.

In this case, Officer Richards testified that he "clearly" observed the parking pass prior to stopping the vehicle. App. at 31. The parking pass is an exhibit. We need no description of it from the officer. We are looking at the very thing that the officer said he clearly saw: an opaque plastic card that is five inches long and three inches wide. And the trial judge had something even better. He took a "view of the scene" to determine if the parking pass could obstruct a driver's vision in a vehicle similar to the one that the officer had stopped. Id. at 101; see Oral Argument Audio at 9:47 to 9:55, 26:04 to 26:30.

Given these facts, a reasonable officer could suspect that the opaque, five-by-three-inch parking pass dangling from a rearview mirror might violate Code § 46.2-1054 and thus warrant an investigatory stop to find out if it in fact did. Several scenarios show why. The bottom of the parking pass would be at or slightly above eye level for a driver of average height. The parking pass could be at an angle that might partially block a driver's clear view of a vehicle ahead and to the right of him. If that vehicle put on its left-turn signal, for example, the driver with the parking pass might not see it at all — particularly when the vehicle is merging into highway traffic from an on-ramp. If a driver simply wanted to make a right turn at an intersection, the parking pass could partially obscure his field of vision. An enhanced risk would exist when the driving occurs at night and only the rear running lights of a vehicle ahead and to the right are visible. Consider, too, highway signs that are often placed overhead and on the right shoulder of

---

[21] Crouse, 188 Va. at 165, 49 S.E.2d at 426 ("The Motor Vehicle Code of Virginia recognizes the right of both the pedestrian and motorist to use the highways for travel.").

- 27 -

the highway.[22] A person of any height could have his clear view of highway signs partially obstructed by the parking pass especially, once again, during nighttime driving.

Under settled law, an officer need not have proof beyond a reasonable doubt of any of these scenarios before he makes a vehicular stop. Nor does he need to be convinced by a preponderance of the evidence. To be sure, the quantum of confidence need not even rise to the level of probable cause. See Perry, 280 Va. at 581, 701 S.E.2d at 436. He need only have a reasonable suspicion of a violation of Code § 46.2-1054, which merely requires that he be aware of articulable facts suggesting that the parking pass could be non-compliant with the statute.

Though it was legally unnecessary for Officer Richards to testify that he *subjectively* believed the parking pass could have obscured the driver's clear view of the highway, Raab, 50 Va. App. at 583 n.2, 652 S.E.2d at 148 n.2, he did in fact come to this conclusion. Within seconds of stating that he "clearly" saw the parking pass, Officer Richards testified that he believed that it "could obstruct a driver's view." App. at 31. In context, he was speaking of the driver's view of the highway — not something other than the highway.

## III.

The trial court correctly held that a reasonable officer could make an investigatory stop of the vehicle to determine if, in fact, the parking pass violated Code § 46.2-1054.

I respectfully dissent.

---

[22] See *supra* note 14.